PEOPLE *v* WINFIELD

PEOPLE *v* REEVES

PEOPLE *v* JONES

1. CRIMINAL LAW—EVIDENCE—PHOTOGRAPHS—TRUE REPRESENTATION —PRESERVING QUESTION.

The question whether photographs, admitted to show the lighting conditions at the scene of the crime at the time the crime was committed, were properly admitted even though they had been taken several weeks after the crime and at a different time of night than when the crime was committed, was not preserved for appeal where defendant objected at trial to admission only on the ground that the photographs did not accurately show the lighting conditions at the scene of the crime at the time the photographs were taken.

2. ROBBERY—ARMED ROBBERY—USE OF WEAPON—EVIDENCE.

Testimony by an eyewitness that the defendant, charged with armed robbery, had used a knife was sufficient to submit the case to the jury, even though the victim did not see the knife.

3. ROBBERY—ARMED ROBBERY—ELEMENTS.

The elements of armed robbery are an assault upon the complainant by the defendant, a felonious taking of any property from his person or presence which may be the subject of a larceny, and that the defendant be armed with a dangerous weapon or an article which leads the assaulted person to reasonably believe that it is a dangerous weapon.

4. ROBBERY—ARMED ROBBERY—INDICTMENT AND INFORMATION— WEAPON USED.

The people are not required to specify, in an information charging armed robbery, the type of dangerous weapon used; words in the information describing the weapon used are mere sur-

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error § 601 *et seq.*
[2] 46 Am Jur, Robbery § 50 *et seq.*
[3] 46 Am Jur, Robbery § 5 *et seq.*
[4–6] 46 Am Jur, Robbery §§ 33, 55.

plusage and do not require the people to prove that that weapon and only that weapon was used.

5. ROBBERY—ARMED ROBBERY—WEAPON USED—INDICTMENT AND INFORMATION.

Testimony by the victim of a robbery that the robbers hit him with a bottle was sufficient to support a finding of armed robbery, even though the information charged the defendants with using "a dangerous weapon, to wit: a knife", where the court properly instructed the jury as to the definition of a "dangerous weapon", because the naming of the type of weapon in the information was mere surplusage.

6. ROBBERY—ARMED ROBBERY—WEAPON USED—INDICTMENT AND INFORMATION.

An armed robbery information charging defendants with using "a dangerous weapon, to wit: a knife" did not require the court to exclude the jury's considering evidence that the defendants had used a bottle as a dangerous weapon in commiting the robbery, because the naming of the type of weapon in the information was mere surplusage.

Appeal from Genesee, John W. Baker, J. Submitted Division 2 February 1, 1972, at Lansing. (Docket Nos. 10803, 10845, 10849.) Decided March 22, 1972. Leave to appeal denied as to Winfield, 389 Mich.

Kenneth Winfield, Jimmy L. Reeves, and J. D. Jones were convicted of armed robbery. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Robert F. Leonard,* Prosecuting Attorney, and *Donald A. Kuebler,* Chief Assistant Prosecuting Attorney, for the people.

*Sander H. Simen,* for defendant Winfield on appeal.

*Roger W. Kittendorf,* for defendant Reeves on appeal.

*David I. Megdell,* for defendant Jones on appeal.

Before: Danhof, P. J., and T. M. Burns and Van Valkenburg,* JJ.

T. M. Burns, J. At the conclusion of a jury trial, the defendants were all found guilty of robbery armed, MCLA 750.529; MSA 28.797, and sentenced to terms of 7 to 20 years in prison. They appeal as of right. This Court ordered the appeals consolidated.

At the trial, complaining witness, Robby G. Duggins, testified that about 1:40 a.m. on July 7, 1970, he was walking up Brush Alley in Flint when he heard a car drive up behind him and stop. When he looked around, a man was in back of him with a bottle and he asked Duggins for his money. Duggins said he did not have any money and started running. The man then grabbed Duggins and hit him with the bottle, causing Duggins to black out for a few seconds. The man then ripped off Duggins' pocket and took his wallet. Duggins broke away and ran to a bar where someone called an ambulance for him. At the hospital, five stitches were taken in Duggins' head. His missing wallet contained $6, postage stamps, and some other items. He was unable to positively identify his assailant.

Michael Adams testified that he observed the robbery in question. He stated that he had just left a bar and started walking north on Brush Alley when he saw one man jump another. He identified defendant Jones as the man who first grabbed Duggins. He said that Jones had a bottle and Reeves had a knife. After Duggins broke loose, he saw the defendants get into a blue 1963 Buick. Adams telephoned the police, and upon their arrival at the scene, Adams told them what happened.

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

Adams then left; and as he walked on Grand Traverse Street, the defendants drove up behind him and stopped. The man in the back seat offered Adams a ride. Adams identified defendant Winfield as the man in the back seat, defendant Jones as the driver, and defendant Reeves as the front seat passenger. Adams declined the ride saying he was going to work at a gas station on the corner. He said that so the defendants would leave. Adams then telephoned the police again, told them what happened, and gave them the license number of defendants' car.

Officer Fisher testified to getting the license number of the car from Adams. The number was checked and found to belong to an automobile owned by defendant J. D. Jones. The officer went to the vicinity of Jones' address and found the car in question parked on a side street. While observing the auto, he saw three people enter it and drive off. Officer Fisher then radioed for help and when another squad car arrived, the officers stopped the car. All three defendants were in the auto. Two wallets were found in the back seat, one of which belonged to complaining witness Duggins.

Defendants raise three issues on appeal. The first involves certain photographs of the scene which the people introduced for purposes of establishing the lighting conditions at the scene of the crime. Defendants argue that it was error for the court to admit the photographs taken by the Flint Police Department.

The pictures were taken at the scene at 10:30 p.m. on July 30, 1970. The crime occurred about 1:40 a.m. on July 7, 1970. It is defendants' position that before the pictures could be admitted, the people had to lay a proper foundation by establishing that the lighting conditions at the scene were the same at

10:30 p.m. on July 30, 1970, the time the pictures were taken, as they were at 1:40 a.m. on July 7, 1970, the time of the crime.

It is our opinion that the issue was not properly preserved for appeal. Although the introduction of the pictures was objected to by defendants, it was for an entirely different reason. Defense counsel, while cross-examining the officer who took the pictures, asked several questions pertaining to shutter speed, what type of film was used, and how wide the lens was on the camera. His purpose in asking the questions was to establish that the lens, shutter speed, and the film used by the officer would result in a lighter picture than if another lens, shutter speed, and film had been used. The pertinent part of the cross-examination is as follows:

"*Q.* Could you describe the speed of the film, the speed of the film itself?

"*A.* The film that I was using?

"*Q.* Yes.

"*A.* ASA speed of 400.

"*Q.* Could you explain to the jurors what 400 means?

"*A.* It's an index used on film. There's fast film and slow film and it's used under different conditions.

"*Q.* What is fast film used for?

"*A.* Fast film is used where there is less light or not favorable lighting conditions to take pictures.

"*Q.* Is it your opinion, based on your prior experience, that faster film would make the picture or the scene taken look much lighter than slower film?

"*A.* Yes, sir.

"*Q.* If you had taken these pictures with slower film, the picture itself, all of the pictures, would have been much darker, is that correct?

"*A.* It could have been, yes, sir.

"*Q.* Could you describe what a lens opening means?

"*A.* A lens opening is on the front of the camera and that regulates the light that hits the film in the camera.

"*Q.* Could you tell me what kind of camera you used?

"*A.* I used a 4 x 5 Graphic camera.

"*Q.* How small an opening did your camera go to?

"*A.* I think the one I used went down from 2.8, 5.6 to 22.

"*Q.* You stated there is a 5.6?

"*A.* Yes.

"*Q.* Five point six is much closer to 2.8 than 22, is that correct?

"*A.* The lower the number, the wider the lens opening would be.

"*Q.* Does that have an effect, too, make it lighter in appearance?

"*A.* Allows more light to come in, yes, sir.

"*Q.* Then are you stating that this lens would show, taking it at 5.6, would indicate it much lighter than 22?

"*A.* Yes, sir.

"*Q.* You stated, I believe, or I may ask you, was this a still shot?

"*A.* Yes, sir.

"*Q.* I believe it's five seconds?

"*A.* Yes, sir.

"*Q.* Would five seconds be lighter than one second?

"*A.* Yes, sir.

"*Q.* So more light would come into the camera?

"*A.* Yes, sir.

"*Q.* Would that have the effect of making the scene look lighter?

"*A.* Yes, sir.

"*Q.* You have stated this is a true and accurate representation of the scene. Could you—are you

stating it is of the scene but excluding the light conditions?

"*A*. In printing those pictures, I tried to print those as close to exactly as I saw it that night.

"*Q*. It is possible they are much brighter than what would be viewed by the eye, in your opinion?

"*A*. Not in my opinion, no, sir."

Defense counsel then objected in the following manner:

"*Mr. Shaheen:* Your Honor, foreseeing that the prosecuting attorney wishes to introduce these, I will have an objection, being the length of time, being a posed picture for five seconds, the nature of the lens opening being a very wide opening, the nature of the film being a very fast film. We submit they are not true and accurate representations as to lighting condition. As to the locale, we are not disagreeing. We submit these are not true and accurate representations."

It is readily apparent from the cross-examination and the way the objection was stated that defense counsel was not objecting to the introduction of the pictures because they were taken at a different time on a later date, *i.e.,* because of the lack of a proper foundation; counsel objected because he felt the pictures did not properly illustrate the lighting conditions at the scene of the crime *at the time the pictures were taken.* Defense counsel obviously felt that the procedure, shutter speed, and film used by the officer resulted in a brighter picture than the actual conditions photographed at the scene would dictate. However, the officer stated that the pictures accurately represented the scene, as he saw it, at the time the pictures were taken. The question of how accurate the pictures were was, therefore, for the jury. We would also note that the trial court cautioned the jury that there might be a variance in the lighting in the photographs and the lighting at the scene.

Defendants' objection was not based upon the fact that the crime occurred at one time on a given date while the photographs were taken at a different time at a later date. The court was not asked to rule on the foundation question at all. Therefore, we will not discuss the issue since it was not properly preserved for appeal.

Defendants secondly contend that they should have been granted directed verdicts because there was no testimony from the victim that he saw a knife. There is no merit to this contention. There was ample evidence to go to the jury based on Adams' testimony that there was an armed robbery with a knife. Defendants cite no authority to support the position that the weapon must be seen by the victim in order to establish sufficient evidence to go to the jury on a charge of armed robbery. It is our opinion that witness Adams' testimony was sufficient to establish the elements of the crime charged and the trial court was, therefore, correct in refusing to grant defendants a directed verdict.

Defendants next contend that the trial court should have instructed the jury that unless they found that there was a knife involved in the robbery, they must return a verdict of not guilty.

Defendants argue that the information charged them with robbery armed with "a dangerous weapon to wit: a knife". There was no mention of the bottle in the information although there was testimony regarding the use of the bottle to subdue the victim. It is defendants' position that without the instruction the jury could have found defendants guilty if they found that only a bottle was used, a verdict which could not be supported by the information.

While defendants concede that under the proper circumstances a bottle could be a dangerous weapon within the meaning of the statute, they also contend

that because the information contains the words "to wit: a knife", the jury must find that a knife was used before they can return a verdict of guilty. It is their position, therefore, that the trial court should have, by way of instruction, excluded the possibility of returning a verdict of guilty if they found that a bottle was used in the robbery but not a knife.

We disagree. MCLA 750.529; MSA 28.797 provides:

"Any person who shall assault another, and shall feloniously rob, steal and take from his person, or in his presence, any money or other property, which may be the subject of larceny, such robber being armed with a dangerous weapon, or any article used or fashioned in a manner to lead the persons so assaulted to reasonably believe it to be a dangerous weapon, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years."

Thus, the elements of the crime are an assault upon the complainant by the defendant, a felonious taking of any property from his person or presence which may be the subject of a larceny, and that he be armed with a dangerous weapon or an article which leads the assaulted person to reasonably believe that it is a dangerous weapon.

A "dangerous weapon" has been defined as:

"Some weapons carry their dangerous character because so designed and are, when employed, *per se,* deadly, while other instrumentalities are not dangerous weapons unless turned to such purpose. The test as to the latter is whether the instrumentality was used as a weapon and, when so employed in an assault, dangerous. The character of a dangerous weapon attaches by adoption when the instrumentality is applied to use against another in furtherance of an assault. When the purpose is evidenced by act, and the instrumentality is adapted to accomplish-

ment of the assault and capable of inflicting serious injury, then it is, when so employed, a dangerous weapon." *People* v *Goolsby,* 284 Mich 375, 378 (1938).

Under the above definition either a knife or a bottle used to hit the victim over the head would be a dangerous weapon. In our opinion the jury should have been able to return a verdict of guilty if they found that a knife was used, a bottle was used, or both were used despite the wording of the information.

There is no rule of law requiring the people to specify in the information what type of dangerous weapon was used in the perpetration of the robbery. Had the information merely charged defendants with robbery while armed with a dangerous weapon, it would have been sufficient under the statute. In our opinion the words "to wit: a knife" are mere surplusage and in no way add another element to the crime making it incumbent upon the people to prove that a particular weapon and only that particular weapon was used in the perpetration of the robbery. The trial court properly instructed the jury as to the definition of a "dangerous weapon". The fact that the information contained the words "to wit: a knife" did not require the court to exclude from the jury's consideration the proofs concerning the bottle. We find no merit in this contention.

Defendants finally argue that it was error for the trial court not to give instructions on the lesser offenses of felonious assault and larceny from a person.

Although there was some dialogue between counsel and the court as to what instructions would be given, our review of the record reveals that there was no proper request for such instructions nor was there any objection to the instructions given. Therefore,

the issue was not properly preserved for appeal. *People* v *Netzel,* 295 Mich 353 (1940).

However, even assuming that the request was properly made, the trial court was under no obligation to give the instructions since, in our opinion, verdicts on the lesser offenses would not have been supported by the evidence. See *People* v *Membres,* 34 Mich App 224 (1971). We find no reversible error in the trial court's instructions.

Affirmed.

All concurred.